## HOHENBERGER et ux. v. OSBORNE et ux.

### No. 3184.

Court of Civil Appeals of Texas. Beaumont.

Jan. 27, 1938.

Rehearing Denied Feb. 9, 1938.

R. H. Mercer and H. C. Covington, both of San Antonio, for appellants.

Randle Taylor, of San Antonio, for appellees.

WALKER, Chief Justice.

This appeal was prosecuted from the judgment of the lower court to the San Antonio Court of Civil Appeals, and transferred to our docket by order of the Supreme Court.

On the 5th day of December, 1935, appellees, R. A. Osborne and wife, Marjorie Osborne, instituted this suit against appellants, H. R. Hohenberger and wife, Emmie Hohenberger, alleging that Mrs. Hohenberger negligently backed an automobile she was driving over and against Mrs. Osborne, to her great personal injury; appellees prayed for judgment for the resulting damages. On the verdict of the jury, answering special issues, appellees were awarded damages against appellants for $1,500.

We overrule appellants' assignment that the verdict was excessive; on this issue we adopt the following statement made by appellees:

"Appellee, Marjorie Osborne, had both ankle bones broken and the ligaments around the ankle joint torn loose. For three weeks a cast was on her leg and foot from the knee. After the cast was removed her leg and ankle were bandaged very tightly and she wore a brace on her ankle and foot from October 2, 1935, to the middle of June, 1936. She used crutches to go about the home after being in bed for about three weeks during which time she suffered much pain, inability to sleep and prolonged nervousness and often placed her foot and leg in an elevated position. One year after the accident she was unable to wear high-heeled shoes and it was undisputed that up to the time of the trial (one year) the ankle would ache, especially when the weather changed and Dr. T. E. Christian, appellants' witness, and Dr. H. C. Sweet, appellees' witness, both testified that this was to be expected. At the time of the injuries, appellant Mrs. Osborne had been treated for about a year by Dr. Lee Rice for a nervous condition and stomach trouble and the pain and suffering from the broken ankle joint and torn ligaments revived and intensified this trouble. Dr. T. E. Christian, appellants'

witness, testified that this kind of an injury could have that result. Appellants repeatedly say that the doctors bills, X-ray and medical bills were only $35.00, when it was agreed by counsel that the bill for Dr. Sweet was $35.00 for setting the broken bones and for two X-rays $5.00 and appellee Osborne testified that doctor bills, X-ray, medicines and supplies would amount to about $75.00. Dr. H. C. Sweet, who was the attending physician testified that the distance between the two ankle bones showed a widening of twice the normal width out of the former position, testifying:

" 'Yes, it is probably twice its normal width between the two bones.

" 'Q. * * * Now, Doctor, you say that those breaks there are around what is known as a joint? A. They are around the ankle joint.

" 'Q. Doctor, is the breaking of bones around the joint of a more serious and troublesome character than the breaking of bones in the finger, leg, or a straight bone in your arm, or anywhere else? A. Yes, they are, because of the fact that those bones, when they heal, have to heal smoothly or there will be interference with the action of the bones.'

"He further testified:

" 'Q. From the nature of those breaks there and the condition that you found there, did you find the tissues and ligaments and things of that kind torn? A. Well, the ligaments were torn loose from the posterior ankle bone; that is, from the fact that that whole top of the bone was pulled loose from that.

" 'Q. Are torn ligaments something that usually cause pain and discomfort and soreness? A. Very much pain and soreness at first, yes.

" 'Q. How would those torn ligaments be affected when around the joint there? A. You do not have ligaments torn in the ankle bone except around the joint, because that is the place where a ligament comes into place.

" 'Q. And those ligaments were torn loose? A. Yes, sir.

" 'Q. Now, Doctor, in an injury of that kind to the joint—torn ligaments, broken bones—would you say it would take a year or more to heal up, or what would happen, how long, what is your opinion on it? A. It takes probably, as far as actual healing and getting back to where you can bear

weight on it without any danger to the injury to do it, it takes probably six weeks or two months; but it is apt to be painful for a long time after that, because those breaks around the joint tend to have a certain barometric character, that they cause rheumatics during a bad change—changes in the weather, things like that; that might not happen very often, might happen quite frequently, that is something you can't tell.

" 'Q. Doctor, are there cases of that kind known to medical science where it may have continued over a period of years, say, through the case of a person's life? A. Yes, they might do that.

" 'Q. Now, Doctor, a person suffering from that kind of injury, would it be an advisable thing to do and would you advise a patient, to help alleviate the pain and throbbing and so on, to get in a position where she would elevate her foot up high? A. That always helps to alleviate the pain in an injury to an extremity, either a hand or a foot, to be raised where the blood doesn't cause it to throb—it throbs when down, and when raised up the blood doesn't throb so badly.' "

This testimony clearly and satisfactorily supports the award of $1,500.

By their assignments of error appellants assert that the jury, while deliberating upon its verdict, was guilty of misconduct in the following respects: (a) It discussed the amount of attorney's fees appellees would be required to pay out of any recovery allowed them; (b) it discussed the fact that appellants carried indemnity insurance; (c) it discussed the relative financial standing of the parties—that appellants were rich, and appellees were poor. These assignments are without support in the evidence. On motion for a new trial eleven of the jurors were sworn and gave testimony. Juror Staffa testified:

"Q. Now, Mr. Staffa, during the time that you were arriving at answers to these questions, tell the Judge whether or not you heard any discussion on attorneys' fees, or was there any argument about it? A. I don't think there was anything said about that at all.

"Q. In your consideration of this case, were you influenced or controlled by anything other than the testimony and evidence that you heard from the witness stand? A. That was all. * * *

"Q. Did some of them go up to $5000.00? A. Started out at about $7000.00.

"Q. And then went on down to these other amounts. A. Yes, sir."

Juror Byrd testified:

"Well, I thought, in my mind, and my suggestion, she should have about $2000.00, and of course we thought—we got together then on the different prices. * * *

"Q. Were you in there when the foreman told the jury not to talk about insurance or attorneys' fees, or anything like that? A. The foreman never said anything like that; if he did, I didn't hear him.

"Q. Now, tell the Court, if any such discussion did take place, what was said and done in there about attorneys' fees having to be paid in this case, just tell Judge Johnson what took place, if anything did, and what you heard about it, on that subject? A. Well, there didn't anything take place about attorneys' fees."

Juror Johnson testified:

"Q. Now, Mr. Johnson, you said you didn't take any of these things into consideration. Now, in arriving at your verdict, I take it you did not consider attorneys' fees in the amount you were going to give? A. I did not.

"Q. Now, Mr. Johnson, the verdict that was arrived at and that was returned into Court, that was your verdict and you agreed to it, didn't you? A. Yes, sir, one fellow suggested that we settle for $5,000.00.

"Q. That was when the discussion first started? A. When we first went in there.

"Q. And you joined them and agreed to that, (to the $1500.00 verdict) in your opinion justly? A. Yes, sir."

In answer to questions by the court, this witness said:

"Q. Mr. Johnson, you stated that there was someone that mentioned attorneys' fees and there was somebody that mentioned insurance. Can you give the Court the name of any juror in there that mentioned either one of those items? A. I cannot, your Honor."

Juror Bradley, appellants' main witness, testified:

"Q. The foreman never did tell you you were not to consider the matter of insurance or attorneys' fees? A. No, sir.

"Q. And at no time made any mention of that? A. No, sir. * * *"

Further questions by the court to Juror Bradley and answers:

"Q. You never said a word concerning either of these two items, attorneys' fees or insurance? A. No, sir.

"Q. And you do not remember the name of any juror that mentioned it and you do not believe that you would recognize his face? A. No, I don't. * * *

"The Court: Mr. Sheriff, bring in these other jurors—all of them.

"Q. (By the Court): Now, do you recognize the face of any juror there that mentioned either of these two items in the jury room? A. No, I couldn't say.

"Q. Did any of these eight men mention either one of those items? A. I couldn't say."

Juror Bradley testified positively that he did not take attorney's fees into consideration in reaching his verdict, and, in answer to the question if he did, said: "No, not a bit."

On the discussion of attorney's fees Juror Cook testified, "I don't remember anything of that kind"; and further: "Q. You did not at any time take attorneys' fees into consideration? A. Not consciously. I think sometimes unconsciously a person realizes in this day and time an attorney does get something from it if there is any award."

Juror T. M. Kissling testified:

"Q. * * * During that discussion at the time there, did you bring up any subject about insurance or attorneys' fees, or —A. None, whatever.

"Q. Well, tell the Court whether or not you heard an argument or discussion there or anything about that, or if it was just mentioned? A. Well, if it was mentioned it was so fleeting I haven't the least remembrance—they didn't say much, most of the things were settling on the verdict."

Juror Kissling testified further:

"Q. Now, these matters here that Mr. Taylor has inquired about—attorneys' fees and insurance—if those things were discussed, you didn't hear that, is that right? A. What things?

"Q. Such as attorneys' fees and insurance? A. No."

On redirect examination Juror Kissling testified positively that he did not take attorney's fees into consideration in giving his verdict.

Juror Kossub testified:

"Q. Mr. Kossub, tell Judge Johnson whether or not, after the jury retired to

the jury room, they had any discussion or argument about attorney's fees in this case? A. Not that I remember.

"Q. During any of that time, did you bring up the subject of insurance or attorney's fees? A. No, sir, I did not."

He further testified in reaching a verdict that: "No, it was the larger men came down."

The juror Emila Salas testified:

"Q. Did you hear any discussion in there take place, or any argument about attorneys' fees? A. No, sir, I did not.

"Q. Did you take anything like that in consideration in arriving at the answers to the questions? A. No, sir. * * *

"Q. In other words, they may have discussed those things (attorneys' fees and insurance) in there and you not know anything about it, is that right? A. No, because I didn't hear it."

The juror Lino Sanchez testified that he did not bring up the subject of attorney's fees in the jury room, and further:

"Q. Now, during that time, what discussion or argument was had in there, if any, that you heard, about attorneys' fees in this case? A. I don't remember anything about that.

"Q. You are not hard of hearing, are you, Mr. Sanchez? A. No, sir.

"Q. And if there had been an argument or discussion in there about it, do you think you could have heard it? A. Yes, I think I could have."

The juror A. S. McMurray, being the eleventh juror to testify:

"Q. Now, Mr. McMurray, during the time that you were deliberating on these questions, did you at any time bring up the subject of attorneys' fees and discuss it? A. No, sir.

"Q. During that time, did you hear anybody else bring up attorneys' fees and suggest that that should be taken into consideration, and the jury entered into discussion or argument about it? A. No, sir.

"Q. You didn't hear that? A. No, sir.

"Q. You are a man that can hear pretty good, aren't you, Mr. McMurray? A. Yes, sir.

"Q. You do not have any trouble with your hearing? A. No, sir.

"Q. And you heard no discussion about taking attorneys' fees into consideration? A. No, sir."

The testimony on the issues of "insurance" and "relative wealth of the parties" is on all fours with the testimony on the issue of "attorney's fees." The testimony supports the judgment of the court that the jury was not guilty of misconduct in any of the respects charged by appellants in their motion for new trial.

It follows that the judgment of the lower court should be in all things affirmed, and it is accordingly so ordered.

Affirmed.